IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Judge John L. Kane

Civil Action No. **12-cv-1275-AP**

**DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT**,
**SAN JUAN CITIZENS ALLIANCE**,
**SIERRA CLUB**,
**CENTER FOR BIOLOGICAL DIVERSITY**, and
**AMIGOS BRAVOS,**

    Plaintiffs,

    v.

**UNITED STATES OFFICE OF SURFACE MINING RECLAMATION AND ENFORCEMENT**, an agency within the U.S. Department of Interior;
**KENNETH L. SALAZAR**, in his official capacity as Secretary of the Interior;
**AL KLEIN**, in his official capacity as Regional Director of the U.S. Office of Surface Mining Reclamation and Enforcement, Western Division;
**BOB POSTLE**, in his official capacity as Manager of the Program Support Division for the Western Region of the Office of Surface Mining Reclamation and Enforcement;
**RICK WILLIAMSON**, in his official capacity as Manager of the Indian Programs Branch of the Western Region of the Office of Surface Mining Reclamation and Enforcement; and
**MYCHAL YELLOWMAN**, in his official capacity as Navajo Mine Team Leader in the Office of Surface Mining Reclamation and Enforcement,

    Defendants.

ORDER DENYING MOTION TO DISMISS

**Judge John L. Kane, ORDERS**

Respondent-Intervenor the Navajo Nation ("Tribe") moves to dismiss this lawsuit for failure to join a party pursuant to Federal Rules of Civil Procedure 12(b)(7) and 19. The lynchpin of the Tribe's argument is the doctrine of sovereign immunity, namely that because it is both an indispensable party and immune from suit, the action itself must be dismissed. (Doc. 22) Diné Citizens Against Ruining Our Environment ("Diné CARE"), San Juan Citizens Alliance,

1

Sierra Club, the Center for Biological Diversity, and Amigos Bravos (collectively, "Citizens") oppose the motion, urging me to apply the public rights exception to traditional joinder rules involving sovereign immunity. I accept the invitation and DENY the motion to dismiss.[1]

*Background*[2]

The Navajo Mine, operated by Respondent-Intervenor BHP Navajo Coal Company (BHP), is an open-pit coal strip mine sprawling over 13,000 acres. The mine is located entirely within the boundaries of the Navajo Reservation on land the Tribe originally leased to BHP's predecessor (Utah Construction and Mining Company) in 1957. Strip-mining operations have been ongoing since the early 1960s. Respondent Office of Surface Mining Enforcement and Reclamation (OSM) is the regulatory authority for permitting strip-mining and assuring compliance with the National Environmental Policy Act (NEPA) for operations on Indian lands, and the tribes comment through the Bureau of Indian Affairs (BIA) on permitting decisions. 30 C.F.R. § 750.6(a)(1)-(2), (7), (d); cf. 30 U.S.C. § 1300(j) (granting tribes limited authority over abandoned mine programs on Indian lands, but not general permitting and regulatory authority).

The Navajo Mine is, and has always been, the sole source of coal for the adjacent Four Corners Power Plant (FCPP), which was built specifically to burn the coal from that mine. The Navajo Mine supplies approximately 8.5 million tons of coal to FCPP annually, though that number may fluctuate downward to as low as 6.4 million tons, depending on FCPP's demands.

---

[1] The Tribe's Motion to Dismiss was filed in conjunction with its Motion to Intervene, whereupon receiving I issued a Minute Order stating: "Plaintiffs [sic] shall file a response either opposing or acquiescing to [the Nation's] motions as set forth in [22] no later than October 1, 2012, by Judge John L. Kane on 9/10/12." ECF No. 24. On September 27, 2012, Petitioners filed their Response in Opposition to the Tribe's Motion to Dismiss, with three supporting declarations and an attachment. ECF Nos. 25, 25-1, 25-2, 25-3, 25-4. Because Petitioners' Response argues only against dismissal and does not protest intervention, Petitioners acquiesced and accepted that the Nation's limited intervention in this case pursuant to Rule 24(a) to move for dismissal is appropriate. Thus, this Order addresses only the Tribe's Motion to Dismiss.
[2] Unless otherwise noted, all facts are drawn from the Complaint. (Doc. 1)

Currently, BHP is contractually obligated to supply FCPP with coal from the Navajo Mine through early July 2016. Toward that end, BHP seeks to expand mining operations into a portion of the existing deposits ("Area IV North"). Area IV North contains approximately 12.7 million tons of coal. Currently permitted Areas II and III of the mine contain 30.8 million tons of coal. In 2005 the Federal Respondents approved a permit revision allowing strip-mining operations to expand over 3,800 acres into Area IV North. This decision was based on a fourteen-page environmental assessment (EA). *Diné CARE v. Klein* (*Diné CARE I*), 676 F. Supp. 2d 1198, 1203 (D. Colo. 2009)(Kane, J.). Diné CARE and San Juan Citizens Alliance sued OSM, alleging the EA did not comply with the procedural requirements of NEPA, 42 U.S.C. §§ 4321-4370h, seeking, among other things, to enjoin mining operations in Area IV North until OSM compliance was acheived. *Diné CARE I*, 676 F. Supp. 2d at 1203, 1204.

As here, OSM and the intervenors moved to dismiss in *Diné I* on the basis of Rule 19 for nonjoinder of the Navajo Nation. *Id.* at 1204. I denied the motion, *see id.* at 1215-17, later ruling in the petitioners' favor on the merits and remanding the matter to OSM to conduct a lawful NEPA analysis. *Diné CARE v. Klein* (*Diné CARE II*), 747 F. Supp. 2d 1234, 1263-64 (D. Colo. 2010).

On remand, OSM reduced the size of the proposed mine expansion into Area IV North and prepared another EA. Despite Citizens submitting extensive comments advocating for a more extensive review of environmental impacts, OSM issued a Finding of No Significant Impact ("FONSI") and approved the mine expansion. Citizens again sought judicial review, bringing the instant case for declaratory relief and injunctive relief limited to future mining operations in Area IV North. BHP again intervened as a defendant, and the Tribe then moved to

intervene for the limited purpose of filing their motion to dismiss. The matter has been fully briefed and is ripe for my review.

*Discussion*

The Tribe is not a party to this action and cannot be joined as a result of sovereign immunity. *See Manygoats v. Kleppe,* 558 F.2d 556, 558 (10th Cir.1977). Turning these jurisdictional truths to its advantage, the Tribe asserts it is additionally an indispensable party under FRCP 19 so that the action must be dismissed in its entirety. By this logic, virtually all public and private activity on Indian lands would be immune from any oversight under the government's environmental laws. This is neither the intent nor the import of Indian sovereign immunity.

There are three parts to a finding of indispensability under Fed. R. Civ. P. 19(b). *See Citizen Potawatomi Nation v. Norton*, 248 F.3d 993, 997 (10th Cir. 2001). First, I must find that a prospective party is "required to be joined" under Rule 19(a). Second, I must determine that the required party cannot feasibly be joined. Then I must determine, under Rule 19(b), whether the required-but-not-feasibly-joined party is so important to the action that the action cannot "in equity and good conscience" proceed in that person's absence. Fed. R. Civ. P. 19(b). When that is so, the action "should be dismissed." *Id*. The Tribe, as the proponent of this Rule 12(b)(7) defense, has "the burden of producing evidence" showing both that the Tribe is a required party and that dismissal is required in its absence. *See Citizen Band Potawatomi Indian Tribe v. Collier,* 17 F.3d 1292, 1293 (10th Cir.1994) (proponent has burden of production, which "can be satisfied by providing affidavits of persons having knowledge of these interests as well as other relevant extra-pleading evidence;" internal quotation omitted).

4

It is indisputably clear the Tribe meets the "necessary" or "required" party standard for indispensability because the Tribe receives financial and other benefits from the mine's operation. *See Manygoats* at 558. In light of the Tribe's immunity from suit, I therefore proceed to the Rule 19(b) question of "whether, in equity and good conscience, the action should proceed" in the Tribe's absence. Fed.R.Civ.P. 19(b). Under the Rule, I must consider the following factors in deciding this question: (1) the extent to which a judgment rendered in the Tribe's absence might prejudice the Tribe or the existing parties; (2) the extent to which any prejudice could be lessened or avoided; (3) whether judgment rendered in the Tribe's absence would be adequate; and (4) whether Plaintiffs would have an adequate remedy if the action were dismissed for non-joinder. Fed.R.Civ.P. 19(b); *Thunder Basin Coal Co. v. Southwestern Pub. Serv. Co.,* 104 F.3d 1205, 1211 (10th Cir.1997).

In *Manygoats*, for example, the Tenth Circuit ruled the Tribe would not be prejudiced by a judgment rendered in its absence because the requested relief, injunction of the Secretary's approval until he complied with NEPA, did not call for any action by or against the Tribe. 558 F.2d at 558-59. The Court also found that dismissal of the action for nonjoinder of the Tribe "would produce an anomalous result" because then "[n]o one, except the Tribe, could seek review of [a NEPA-required] environmental impact statement covering significant federal action relating to leases or agreements for development of natural resources on Indian lands." *Id.* at 559. This result, the court found, was not consistent with the national environmental policy set forth in NEPA. *Id.* For this reason and because no known tribal remedies or procedures were available to plaintiff, the Tenth Circuit held that "[i]n equity and good conscience the case should and can proceed without the presence of the Tribe as a party." *Id.*

The Tenth Circuit took a different tack in *Tewa Tesuque v. Morton*, 498 F.2d 240 (10th Cir. 1974), cert. denied, *682 420 U.S. 962, 95 S.Ct. 1353, 43 L.Ed.2d 440 (1975), granting dismissal. *Tewa Tesuque* is distinguishable from *Manygoats*, however, on at least two bases. First, in *Tewa Tesuque*, plaintiffs had attacked an existing lease to which the Pueblo was a party, whereas in *Manygoats* all that was sought was the enjoining of the Secretary from approving a pending lease. In *Tewa Tesuque* the assault was directed at the lease; in *Manygoats* it was aimed at the Secretary's approval of the lease. Second, in *Manygoats,* the cause of action was brought under NEPA, whereas NEPA was not considered by the court in *Tewa Tesuque.*

Consideration of the two distinctions between *Tewa Tesuque* and *Manygoats* informs my determination concerning the indispensability of the Navajo Nation here. Because this action involves an attack on lease approvals as opposed to an attack on the leases themselves and because this action is brought under NEPA, I find, just as I found in *Diné CARE I*, that the instant action is more akin to *Manygoats*.

All the same, the Tribe argues sovereign immunity must be given cardinal weight in the indispensability calculus of 19(b), declaiming *Manygoats* and *Diné CARE I* as obsolete in light of *Republic of the Philippine's v. Pimentel*, 553 U.S. 851, 863-875 (2008). Although their argument is made earnestly, *Pimentel* is wholly distinguishable from the case at bar and entirely unpersuasive for the proposition advanced by the Tribe.

*Pimentel* was an interpleader action, in which several parties alleged that funds were wrongfully taken by the Republic of the Philippines' ("Republic") former government. 553 U.S. at 855, 857-61, 871. When joinder was attempted by existing parties, the Republic successfully asserted sovereign immunity and was dismissed from the action. *In re Republic of the Phil.,* 309 F.3d 1143, 1149-52 (9th Cir.2002). The Republic then moved to dismiss as an indispensible

party under Rule 19, won, and the issue proceeded all the way to the Supreme Court, which upheld the dismissal. *Id*. at 873.

Applying the enumerated factors of Rule 19(b) (required party status was uncontested), the Court first reasoned that there was potentially significant prejudice to the Republic because the suit to proceed in its absence would undermine interests in comity and the dignity between foreign sovereigns endowed with "perfect equality and absolute independence." *Id*. at 865-66 (quoting *Schooner Exchange v. McFaddon*, 7 Cranch 116, 137 (1812)). The Court noted the "specific affront" of the Republic's claimed property being "seized by the decree of a foreign court." *Id*. at 866.

The third Rule 19(b) factor also favored dismissal because the Republic would not be bound by a judgment and presumably could bring additional litigation to recover the disputed funds. *Id*. at 870-71. Regarding the fourth factor, the bank, which was the plaintiff in the interpleader, would suffer little prejudice from dismissal because it could have any future actions against it dismissed under Rule 19 for nonjoinder of the Republic. *Id*. at 871-72. Also, though dismissal would in part harm the "international policy" of "combating public corruption," that international policy underscored the comity interests of foreign sovereigns. *Id.* Finally, the Court noted that the balance of the equities could change if the special Philippine court tasked with resolving ownership of properties embezzled by Marcos did not resolve the case in a "reasonable period of time." *Id.* at 859, 873.

*Pimentel* thus differs from the instant case in the following respects: To begin, unlike this case and *Manygoats*, which both involve challenges to federal respondents' compliance with procedural obligations imposed by federal law, *Pimentel* was a dispute over property (money) to which the absent party claimed a legal entitlement. *Compare Pimentel*, 553 U.S. at 866 (noting

the affront to the Republic of having "property they claim . . .seized by the decree of a foreign court); *with Manygoats*, 558 F.2d at 558 (noting challenge was not to tribal contract but "to the adequacy of the impact statement the Secretary must consider").  This distinction is critical because though the *Ex Parte Young* exception, elaborated below, allows suits against officers of state or tribal sovereigns for "prospective injunctive relief," it does not allow similar suits seeking "retroactive monetary relief." *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 278(1989).

Moreover, in *Pimentel*, an alternative forum was available in which the Republic's claim was being adjudicated; the Court suggested that if that forum delayed unreasonably in issuing a decision, the parties might be able to again bring their case in United States federal court. 553 U.S. at 873.  Here, though the Tribe hints at some nebulous alternative forum, it has not credibly identified any judicial forum for review of the BLM's NEPA analysis.

Lastly, and most vitally, *Pimentel* involved "foreign" sovereign immunity, raising comity concerns between co-equal sovereigns. 553 U.S. at 866-67.  Whereas United States federal law does not apply to foreign sovereigns, "general Acts of Congress," including NEPA, do apply on Indian lands. *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 120 (1960), applied in  *Davis v. Morton*, 469 F.2d 593, 597-98 (10th Cir. 1972);  and *Manygoats*, 558 F.2d at 558. Thus, unlike "foreign" sovereign immunity, tribal sovereign immunity does not shield tribal (or state) sovereigns from suit for prospective injunctive relief for violations of federal law.  *See Tenneco Oil Co. v. Sac & Fox Tribe of Indians of Okla.*, 725 F.2d 572, 574-75 (10th Cir. 1984)( named tribal officials were not protected by tribe's sovereign immunity); *Burlington N. & Santa Fe Ry. Co. v.Vaughn,* 509 F.3d 1085, 1092 (9th Cir. 2007)(tribal official allegedly responsible for administration and collection of challenged tax was not immune from suit).  Accordingly, the comity interests associated with tribal sovereign immunity, while present, are tempered here as

in *Manygoats* by the interest in full application of federal environmental law.³  *See Manygoats*, 558 F.2d at 559.

In fact, in the Court's view, *Manygoats* and the instant lawsuit work a "public right," because the claims at hand derive from a federal regulatory scheme.  *See Stern v. Marshall*, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011)(stating the Court applies a "public rights exception" to traditional joinder rules in cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert Government agency is deemed essential to a limited regulatory objective within the agency's authority).  Where a "public right" is at issue, traditional rules of joinder, including sovereign immunity, need not apply.  *See Conner v. Burford*, 848 F.2d 1441, 1460 (9th Cir. 1988)("The appellees' litigation against the government does not purport to adjudicate the right of current lessees; it merely seeks to enforce the public right to administrative compliance with the environmental standards of NEPA and the ESA.").

As the Ninth Circuit observed in *Conner*, dismissing a NEPA case for nonjoinder of an absent party "sound[s] the death knell for any judicial review of executive decisionmaking." 848 F.2d at 1460.   Albeit without explicitly using the phrase "public rights exception," this is the same reasoning the Tenth Circuit employed in *Manygoats* when it noted it would be "anomalous" to dismiss a NEPA case for nonjoinder of a Native American tribe because "[n]o one, except the Tribe, could seek review of an environmental impact statement covering significant federal action relating to leases or agreements of development of natural resources on Indian lands."  558 F.2d at 559.

---

³ To be clear, neither I nor the Citizens denigrate the doctrine of tribal sovereign immunity. It is an important mechanism for, among other things, protecting tribes from "encroachment" by States, *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 758 (1998), and allowing tribes to govern internal tribal affairs, *Tewa Tesuque*, 489 F.2d at 243. However, these internal tribal interests are not implicated in this lawsuit, which instead champions the shared national interest in environmental procedural compliance.

After *Manygoats*, the Tenth Circuit went on to adopt unambiguously the public rights exception, applying the doctrine by name. *See Southern Utah Wilderness Alliance v. Kempthorne*, 525 F.3d 966, 971 n.2 (10th Cir.2008)("We note that Movants as private lessees were not indispensable parties to the district court proceedings because SUWA's action against BLM fell within the "public rights exception" to joinder rules, most notably Fed.R.Civ.P. 19.")(internal quotations omitted); *Northern Arapaho Tribe v. Harnsberger*, 697 F.3d 1272 (10th Cir. 2012)(refusing to apply the public rights exception because this the claims at issue were not "seeking to vindicate broadly applicable public rights, such as the prevention of unfair labor practices or *administrative compliance with environmental protection statutes and regulations*.")(emphasis added). Thus, the recent district court opinions within the Tenth Circuit, namely, *United Keetoowah Band of Cherokee Indians in Oklahoma v. Kempthorne*, 630 F.Supp.2d 1296, 1303-05 (E.D. Okla. 2009) and *ThreeStars Production Co., LLC. V. BP America Production Co*, 2012 WL 917273 (D. Colo. 2012) upon which the Tribe relies so heavily are inapposite. Although these decisions, citing *Pimentel*, all grant motions to dismiss in favor of various Native American tribes on the ground of sovereign immunity, they are only superficially on point. Despite that all the aforementioned do indeed involve sovereign immunity as applied to Native American tribes, nary a one presented NEPA challenges, which fact is significant given the policy concerns that NEPA was enacted to address.[4]   "NEPA is concerned with national environmental interests. Tribal interests may not coincide with national interests. We find nothing in NEPA which excepts Indian lands from national environmental policy."  *Manygoats* 558 F.2d  at 559.

---

[4] I note Respondents also volunteer *Center for Biological Diversity v. Pizarchik*, 2012 WL 872622 (D. Colo. 2012), a case also involving a NEPA challenge, for the proposition that this case must be dismissed.  *Pizarchik*, however, in addition not to being binding authority, specifically declined to consider the merits of the public rights exception, the court calling the argument in that case "woefully underdeveloped."  872622 at *7 fn. 11.

Applying the Rule 19(b) factors to the instant action, I find the analysis of *Manygoats* controls. With respect to the first two factors concerning prejudice, I note the Citizens challenge, as in *Manygoats*, not a legal entitlement of the Tribe (*i.e.,* the lease), but rather the Federal Respondents' allegedly deficient NEPA analysis. If it is determined on the merits of Citizens' challenge that the Federal Respondents must complete an EIS, or otherwise remedy their NEPA analysis, no prejudice will necessarily result to the Tribe, because the requested relief does not call for any action by or against the Tribe.

As to the adequacy of the judgment, that factor too favors allowing the case to proceed. This element reflects the interest of the public and the judicial system in "settling disputes by wholes whenever possible."*Provident Tradesmens Bank & Trust*, 390 U.S. 102, 104, *quoted in Pimentel*, 553 U.S. at 870. If this case proceeds to a resolution on its merits, it will be determined either that the Federal Respondents violated NEPA or that they did not. After that, there will be no remaining dispute to resolve. The Tribe fails to cite any other litigation that will be unresolved by this case. Nor is there any indication that additional litigation will occur if this suit proceeds in the Tribe's absence. Indeed, no additional litigation was engendered by this Court's previous ruling on this matter in *Diné CARE I.*

Finally, the fourth factor, "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder," Fed. R. Civ. P. 19(b)(4), weighs crushingly against dismissal. As mentioned above, the Tribe has failed to show that an alternative forum capable of granting an adequate remedy is available for the Citizens to challenge the Federal Respondents' NEPA analysis. Nor does it appear that any such forum is available, *Manygoats*, 558 F.2d at 559; *Diné CARE I*, 676 at 1217, for the Federal Respondents are the sole authority for issuing strip-mining permits and conducting required NEPA analyses on Indian lands. 30 C.F.R. § §

750.6(a)(1)-(2), (7).  Thus, the Citizens cannot obtain adequate relief from the Tribe.  As such, allowing the action to proceed would severely check NEPA's policy goals and would thwart the objectives of the public rights exception to traditional joinder rules.

The Motion to Dismiss, Doc. 22, is DENIED.  The tribal/foreign government distinction between the instant case and *Pimentel* is fundamental and dispositive; *Manygoats* controls.

DATED: January 4, 2013                                          BY THE COURT:
                                                                /s/ John L. Kane
                                                                Senior U.S. District Court Judge